## THE MERCER.

(Circuit Court of Appeals, Second Circuit. April 25, 1916.)

### No. 191.

COLLISION ☞102—STEAM VESSELS MEETING—MUTUAL FAULTS.

A tug, with a tow alongside, *held* in fault for a collision with a meeting tug on North River, for not keeping a proper lookout, and therefore failing to see the other tug until within 600 feet of her, and for then

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

failing to reduce speed or stop until immediately before collision. The meeting tug also *held* in fault on the ground that, when she saw the other tug approaching head on and 600 or 700 feet away, it was her duty under article 18 of the Inland Rules (Act June 7, 1897, c. 4, § 1, art. 18, 30 Stat. 100 [Comp. St. 1913, § 7892]) to port her helm and signal for passing port to port, instead of which she gave alarm signals and reversed.

[Ed. Note.—For other cases, see Collision, Dec. Dig. ☞102.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by John J. Pareis, owner of the steam tug Eva May, against the steam tug Mercer; the Pennsylvania Railroad Company, claimant. Decree for libelant, and respondent appeals. Modified.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham and Benjamin W. Wells, both of New York City, of counsel), for appellant.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for appellee.

Before WARD and ROGERS, Circuit Judges, and HOUGH, District Judge.

ROGERS, Circuit Judge. The libelant is the sole owner of the steam tug Eva May and has brought this suit against the steam tug Mercer to recover damages for injuries sustained by collision between his vessel and the steam tug Harrisburg, in tow of the Mercer. The court below held the Mercer solely at fault.

The Eva May left her berth at the foot of West Tenth street in the borough of Manhattan, New York City, at about 7 a. m. on December 24, 1912. She was bound for Jersey City. She was ready to start out at about 6 a. m., but there had been a rather heavy snowstorm during the preceding night, and, as it was still snowing, her master deemed it prudent to remain in the slip until the weather conditions became favorable. At 7 o'clock the looked-for change came. The snow stopped falling and the weather cleared, so that the captain of the tugs could see across the river with perfect distinctness. After leaving her berth the Eva May headed across the North River to the New Jersey side of midstream and then went down the river. It is claimed that she was proceeding slowly under one bell.

The tug Mercer, towing the tug Harrisburg on her starboard side, left Pier H., Jersey City, bound for Hoboken. The tide was flood, with a strong breeze from the northeast, blowing straight down the river. The mate of the Mercer testified that he was at an open window of the Harrisburg's pilot house, and the floatman of the Mercer testified that he himself was forward near the stemhead of his tug both keeping lookout. The Mercer claims it was proceeding slowly and carefully up the river, making about 4.5 knots; that when she was about abreast of Pier 7, Hoboken, and about 500 feet from the New Jersey shore, smoke and steam from the Eva May were seen right ahead and about 600 feet away by the lookouts on the Mercer and Harrisburg; that the weather was so thick on account of fog and falling

snow that the master of the Mercer could not make out the Eva May until about 600 feet off the Jersey shore, when she at once blew one blast of the whistle, which was answered by the tug with a signal of two blasts; that, as soon as the Mercer received the cross-signal from the Eva May, her master rang for full speed astern and sounded alarm blasts.

It is alleged, however, by the libelant, that the Mercer was coming up the river with the tide at a high rate of speed. The libelant alleges that, when the Eva May made out ahead the Mercer, the former blew an alarm whistle, stopped, and reversed; that the Mercer replied with a signal of one whistle; that as the latter signal could not be safely complied with the Eva May repeated her alarm signal and continued backing; but that, notwithstanding the alarm signals, the Mercer came on ahead, without slowing or stopping, until just before the collision, and brought the Harrisburg into contact with the Eva May with such force that she very shortly thereafter filled and sank.

There is a conflict of evidence as to the whistle signals exchanged. The appellant's witnesses say the first signal, one blast, was blown by the Mercer, and answered by the Eva May with two; that the Mercer then sounded the alarm, reversed her engines, and again blew the alarm. The appellee's witnesses say that, immediately on sighting the Mercer, the Eva May blew the alarm and backed full speed; that the Mercer then blew one blast, and the Eva May then blew another alarm, and kept backing full speed, and the Mercer then blew an alarm and reversed her engines 450 feet from the Eva May.

The court below was satisfied, and we are satisfied, that the weather was not thick with fog and that no snow was falling at the time of the accident. The master of the Eva May testified that the atmosphere was clear and that one could see from shore to shore. He was corroborated by other witnesses, and among them by one Capt. Newman. The latter was not employed by either party and appears to be an intelligent and wholly disinterested witness. He witnessed the collision from the steam lighter Hector, owned by the Erie Railroad Company, in whose employ he was, and he testified that the weather conditions were good and that he had no difficulty in seeing the New York shore.

The court below thought the Mercer solely at fault, but failed to state the reasons. The captain of the Eva May testified that, when he discovered the Mercer, that boat was heading directly for the Eva May and was 600 or 700 feet distant. He was asked:

"Q. Was she heading so as to pass you on either side, or if her course had continued would you have come together? A. Right for us when I discovered them."

He also testified that as soon as he discovered the Mercer he immediately blew the alarm whistle and rang bells to stop and go back with the engine, full speed; and he added that the signals were obeyed and his boat kept backing full speed. He testified that the Mercer blew one whistle, and that as he could not comply with that signal he blew another alarm. Asked what, if anything, the Mercer did after he blew the second alarm, he said:

"She kept coming for us," and "she was coming very fast."

The result was that the boats came together. On cross-examination he testified as follows:

"Q. You say that you burn soft coal? A. I do. Q. And that there was this exhaust from your exhaust pipe? A. Yes, sir. Q. And that the wind was northeast about? A. Yes. Q. That would blow this smoke and steam in what direction? Down the river ahead of you? A. Down, ahead of us; yes, sir. Q. You were not blowing any fog signals, were you? A. No, sir. Q. This exhaust steam and smoke somewhat obscured the view below, I believe, you said? A. It did, ahead of me. Q. When you saw the Mercer, she was about dead ahead of you, was she? A. A trifle on our starboard or inside. Q. What do you mean by a trifle on your starboard bow? A. Just the inside, I think. Q. It was a head and head situation, I believe. You were coming head and head? A. Yes. Q. And I think you said that she was heading right for you? A. The two tugs. Q. And 500 or 600 feet away? A. Yes, sir."

On examination by the court the following testimony was given by him:

"Q. When you heard the first whistle from the Mercer, was the smoke still ahead of you? A. Yes, sir. Q. And somewhat obscuring your view? A. They came out of that smoke so that I could see them; but I blew the alarm whistle, stopped, and backed my boat. Q. When you backed your boat, when you started to back your boat, what was the condition as to smoke? It was obscuring your view to some extent? A. To some extent, yes; but we were close enough together so that we could see each other. Q. What made you think it was dangerous to continue the course, so as to bring you port to port, instead of stopping? A. We were too close together to go any closer together without stopping and backing; our rules are to stop and back to avoid a collision, which I did. Q. Then you felt that one or the other of you might make some error in maneuver, if you didn't stop? A. That is it."

On his redirect he testified:

"Q. At the time of the collision what effect had the reversed engines upon the forward motion of your tug? A. It would swing the bow of the boat to port. Q. You don't catch me. I mean, were you still going forward in the water, or had you stopped your headway, or which way were you moving at the time of the collision? A. She was going stern first; she had a trifle stern headway on her. Q. That is, your reversed engines had overcome your momentum? A. Yes. Q. And you had started to go astern? A. Yes, sir. Q. If the Mercer had answered your alarm whistle with alarm whistles, and stopped and backed would there have been any collision? A. No, sir."

As respects the finding by the District Judge that the Mercer was in fault, this court fully concurs in that conclusion. There is no good reason why the Mercer did not see the Eva May long before she did. The cloud of black smoke emitted by the Eva May was a much more conspicuous object than the tug herself, and if the Mercer had been alive to the situation, or her lookout not derelict, she would have seen or been advised by the lookout that a tug was coming down the river with her smoke and steam carried ahead of her by the northeast wind, and she would also have known, or at least had reasonable cause to believe, that her own presence in the river might be obscured from the pilot of the down-coming vessel. Under those conditions, it was her duty to blow passing signals and slow down, and, if necessary, stop until a passing agreement was entered into between her and the Eva May.

The Mercer did not, however, slow up or stop, but ran right into peril, stopping and backing only when she was within 100 or 150 feet

of the Eva May. Her engineer testified that after the tow had straightened up the river he got a hook-up bell, and operated under a hook-up bell from that time until just before the collision, when he stopped and reversed full speed. According to the Mercer's own witnesses, she was from the time she started running under a hook-up bell with a flood tide until she was within 100 or 150 feet of the Eva May. She must have been making about 6 miles an hour, notwithstanding the testimony of her witnesses, shown to be inaccurate by their testimony concerning the weather conditions.

The District Judge came to the conclusion that the Eva May was navigated with care and caution and he absolved her from all fault. We find ourselves unable to concur in that conclusion. The Eva May did not, in our opinion, perform her entire legal duty. What she did was to blow her alarm whistle and stop and reverse. The result was that she was thrown across the track of the Mercer. The testimony satisfies us that the Eva May and the Mercer were approaching end on or nearly so. Article 18, rule 1, of the Pilot Rules for Certain Inland Waters reads in part as follows:

"When steam vessels are approaching each other head and head, that is, end on or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other."

The rule required these vessels to pass each other on the port side. There is evidence tending to show that the Eva May starboarded her helm. One of the claimant's witnesses testified that when the two tugs were close to each other the master of the Eva May was seen trying to put his helm aport. On cross-examination it was sought to weaken this evidence, but without success. This would tend to show that the Eva May's helm must have been starboarded, and that the master tried to shift it and could not do so. But, disregarding that, and accepting the testimony of the master of the Eva May, then it appears that the Eva May stopped and backed, when the law required her to port her helm. The master stated that, when he reversed his engines, the effect was to swing the bow of his tug to port. There is no doubt that as a result of what was done the Eva May was swung considerably across the river, and this contributed to the collision. Instead of porting her helm, she stopped and backed. In doing so she violated the law, and she has not shown anything to justify her in her departure from the statutory rule. The departure from that rule puts on the boat attempting to justify it the burden of establishing that the other boat assented by proper signals to the departure. And this burden has not been met in this case.

As both tugs were in fault the damages should be divided, and the decree below modified to conform to this opinion. It is so ordered.